May it please the court, counsel, I'm reserving three minutes of time for rebuttal. All right. I'm Joseph Houghton here on behalf of the defendants' appellants, Nemisto and Place. At the outset, I will concede that Alexander, LeCount, and Marshall, their appeal was untimely filed. Now, as for defendants, Nemisto and Place, they're entitled to qualified immunity. Let me see if I can get this right. So it's not timely filed, so that's off the table, right? Right, exactly. Nemisto and Place are entitled to qualified immunity because it was not clearly established that what plaintiff appellant Moore told them put them on notice as to an excessive risk to Moore's safety. I can't tell in reading this whether you're disputing his account, that he told the prison officials over 50 times that he was subject to threats and violence, or whether you're contending that even if he told them that, that what he said was not enough. Right. Well, for the purpose of this appeal, we cannot contest that those notifications happened. We're saying that notwithstanding the 50 times, the law was not clearly established as to what the prisoner told the officials and what the prison officials knew that placed them on notice as to an excessive risk. I have the faintest idea of what you just said. Okay. The question is, did he, are you conceding, as you must to be an appellant, that he told them what he says he told them? Yes, yes, I'm conceding that. So you're saying that what he says he told them wasn't enough. Right, exactly. What he told them was not enough. How could that possibly be true? When he told them that he was threatened by these gang members, he's stabbed in the eye, he's beaten up a couple different times, what on earth was he supposed to tell them? An inmate number and a day that he's going to be attacked? Well, I think we have to look at the entire timeline in this particular case. Everything starts in 1995 when plaintiff claims that he saved a correction officer's life and then as a result one of the prison gangs, the Latin Counts, put a hit on his life. Now, between 1995 and 2000, Moore claims that he was attacked twice as a result of this earlier incident. But between 2000 and 2010, there were no incidents as Moore was moved from one facility to another. And it was not until June of 2010 in Michigan Reformatory, which was in Ionia, where he was slashed across the face. Now, immediately he was transferred from Ionia, Michigan, which is southwestern Michigan, all the way up to Marquette, which is in the Upper Peninsula, almost 400 miles away. And when he got to Marquette, he sat down with the Security Classification Committee. They talked with him. And for the purposes of this motion, we're conceding that he requested protection then. Did they have a SHU, you're familiar with the SHU, special housing? Did they have special housing they could have put him in? Yes, it would be segregation protective custody. Did they do that? They did not do that. Did they ask for it or he just said no? He, for the purposes of this appeal, he asked for protective custody. They just disregarded it? They disregarded it looking at the facts before them. And now at that point, this was in June of 2010, and Nemisto and Place were both on the Security Classification Committee. And their evaluation at this point proved to be correct for nine months because during that period of time, Moore became a block rep, which means that he was holding himself out as representing various prisoners. He was interacting with a lot of other prisoners. He was speaking with, he claimed he was speaking with Nemisto on a weekly basis and making these requests. But during that period of time, Nemisto had this information. He looked at it and he concluded, you know, Moore is doing, he's up here. He's doing well. You know, he seems to be, he's in a position where he is a block rep. He's not demonstrating that he's actually fearing for his safety at this point. And then so that went on for about nine months until March of 2011. Now, March of 2011, there was an incident where Moore was attacked or was in a fight, was in a fist fight. And from that end, it is, the records that plaintiffs have produced, that fight was not tied to the Latin counts. Now, Moore claims that it was tied to Latin counts, but based upon the documentation that is available, during that fight. So you've just admitted you're not accepting the allegations pled by the plaintiff in this case? Right. Sorry. So the plaintiff says that that was, he says this incident was tied to Latin counts and he says this was tied to the earlier attack. Now, the sheet that, there is a prison fight investigation report and that sheet says, based upon the officer's investigation, this appeared to be tied to different gangs. So he says that he's attacked because he provided information about a possible hit. The prison officials do an investigation. They prepare their own report that says something else. So you just simply say, well, there's no basis for what he says because we did an investigation. You can't do that in a qualified immunity appeal. Well, so plaintiff believes that that was attributed to Latin counts. And so that March attack, however, was not, it was more of a prison fight rather than an attempt on his life because the previously, you know, previously the attempts on Moore's life, as he claims, involved a razor. And then later on, the April- Am I right that this report that you're talking about relative to the fight in the kitchen- Correct. Includes Moore's belief that's documented in the report that he thought he was targeted by the gang because he had ratted somebody out. It said this was related to him helping out an officer. Okay. And then one month later, he's attacked again. Right. One month later, he's attacked again. So there's no temporal problem here. Well, the- If nothing else, you say, geez, you know, 10 years went by, everything's hunky-dory in these various prisons. Then all of a sudden, he's attacked. He says it was because he was helping out. And then one month later, and you guys do nothing. And then one month later, he's attacked again. Well, the nature of this, of the March attack, where it was, it seemed to, the way the report reads is it was a fight that was broken up. And there was no evidence of any sort of tools, any sort of dangerous weapons involved. And I think that's, and I think in the prison context, that fight is not sufficiently tied, I think, to an attempt on his life. Now, and so from the- What's the relevance of whether there were weapons involved? Well, the, I think it goes to whether or not the- Gang members only attacked with weapons? Well, the, well, in this particular case, Plain is contending that there was a hit on his life from the gang members. And from the prison, from the prison guard's perspective, and from the defendant's perspective, if this, to them, it was reasonable for them to conclude that this was an isolated incident, not otherwise related to the, to his claim of the prison gang. Now, because what we have to consider is what the prison guards were thinking at the time, and whether or not the things that had transpired put them on notice that they should have done something. And in the law, it was not clearly established that the plaintiff was facing excessive risk. And- Where does this element about what the prison officials were thinking, where do you get that? Well, it's the notion that the prison officials need to be, in order for them to be devoid of qualified immunity, they need to have been on notice that what they were doing violated clearly established constitutional law. Right. Right. And so the prison officials in this case could not know that what they were doing violated clearly established law because there was no controlling case law in this circuit. And also, the nature of the request and the nature of the harm that they knew that the prisoner was exposed to, that did not rise to the level of a situation where they should have known, or they knew that the plaintiff was facing an excessive risk. When was it that he had this, what was it, some kind of instrument that gouged in his eye? Was this after he had complained? Yeah, it was a pencil. So this was in April. But it's a very significant injury, right? It was a significant injury. This was after he had told them of his fear, or this was before? This was after the fight in March. Yeah. If there are no further questions, I will reserve the remaining of my time for rebuttal. All right. Good morning to the Court. May it please the Court, Adam Miller for the plaintiff appellee, Maurice Moore. As the Court has understood in the last few moments, the government's argument here is relating to the plaintiff didn't give sufficient information to make these defendants aware that there was a risk on his life. And accepting the plaintiff's testimony and his deposition and other documentary evidence is true. The plaintiff is simply not a holding that the Court can make today. I'm looking at the investigative report that your fellow counsel was referring us to. And under reasons and circumstances leading to the incident, Davis, who's the perpetrator of the fight in the kitchen... Your Honor, is this the March 2011 critical incident report? I don't know. Probably. Davis says it was just a fight, he wouldn't give any information. But then Moore, who's your client, Moore said he did not know why Davis came after him. So does your client accept that statement on this investigative report as true or not? No, Your Honor. I believe in another portion of that investigative report, and this is referenced in a previous briefing, is that the plaintiff gave information to an officer in the aftermath of that attack that he believed it was connected to his efforts to assist a prison guard. That's not what it says. It says Moore gave information that there was a possible hit on an officer. This could be the reason why Davis went after him. Correct. But this says that Moore, your client, said he didn't know why Davis came after him. So does your client accept that or does your client... No, my client refutes that in his deposition testimony. So he said that he did tell them something different than what's in this report. Absolutely. Okay. That's what I want. Thank you. Yes. So just to go through the timeline here and try to edify the Court a little bit, counsel referred to a roughly 10-year period where there weren't any serious physical assaults on my client, and that is true. What led to this escalating violence beginning in 2010 was an incident in April of 2010 where my client provided information about a weapon-making ring from a gang member named Martinez. He provided information to defendants at the Michigan Reformatory, which is the southern facility that counsel referenced. That was in April of 2010. In June, a couple months later, is when the first very serious assault with a razor blade across the man's ear, face, and neck occurred. He is immediately transferred to, within a few weeks, is transferred to the Marquette Branch Prison where the two defendants who we're arguing about today sat on the Security Classification Committee at the Marquette Branch Prison. My client is sitting there in this meeting where they decide where he'll be housed and if he'll be provided with protective custody. He has a bandage wrapped around his face. He's telling these defendants what happened a few months ago. He's telling these defendants why it happened. He's telling these defendants that he's in need of protection. And these defendants do nothing. They disregard his claim. And counsel points out that there is a roughly nine-month period between July of 2010 and March of 2011 where the next assault takes place. And I would contend that's simply this prison gang taking a little bit of time to understand where the prisoner's been transferred, where my client's been transferred, how they're going to get another inmate in their control to come after him. And so it takes a few months for them to find out where he is and get someone to do their bidding. And that's what has occurred here. So in March of 2011, he is attacked. There's no weapon involved. He makes a claim in his deposition that this March 2011 attack is, of course, resulting from this series of attacks and the fact that he's been in fear of his life for many years resulting from his meritorious acts in helping the Michigan Department of Corrections. And they do nothing. And I would also highlight that between the March 2011 attack and the April 2014 attack, deposition testimony indicates that he's speaking with Nemisto, one of the defendants here, on a weekly basis seeing what's going on with his request to be put in protective custody. And Nemisto tells him that we're not going to deal with that. You've got a parole hearing coming up. You're going to get out of here soon enough. The risk of you being killed over the next several weeks or months, we're ready to live with that. It's okay. You'll be gone soon enough. Just hang in there. And so he's writing all kinds of administrators during this time. There's a letter attached to my brief that he writes to central administrators in Lansing detailing that he's issued written requests. And I would also point out, now that it's come to mind, that the counsel has pointed out in his brief alleging that my client never made a written request for protection. And that's simply not true. He says so in his deposition testimony. It's in the record. These people, Nemisto and police, were, for the purposes of this appeal, given written notice of his desire for protection. Did he send that to Lansing or was that directly? It was issued to the Marquette Branch Prison officials. It would have been issued to the warden. And that written request issued to officials right there at the Marquette Branch Prison was never produced in discovery, I would contend, because the government had never produced it. And to support the idea that that written request was made, there is a letter in the record that my client wrote to central administrators in Lansing. The date of it is in between these two assaults, the March 2011 assault, the April 2011 assault. He's writing to central administrators saying, I've done everything I can. I've pled for these people to do something for me. They won't do anything for me. I need you to get involved. And that central administrator responds with a letter to the warden at the Marquette Branch Prison, just forwarding the plaintiff's letter on to the on-site defendants saying, what do you have to say about this, Mr. Warden? Why isn't anything being done? Is this true? And this letter is sent to the Marquette Branch Prison officials on April 11, 2011. And on April 24th is when the incident occurs where my client is attacked in a common area with a pencil. He's stabbed through the eye with a pencil. He'll never see out of his right eye again. And then he's subsequently beaten unconscious as this man attempts to end his life. And so the court doesn't have any other questions. I have plenty of time remaining. The issue is here on appeal. What can we attribute these defendants' knowledge as given we're accepting all of the plaintiff's allegations as true? And as to these two defendants, there's just no question that they were given written notice of his request for protection, previously and subsequently given many oral requests for protection. And there's a quote attributed to one of the defendants that he stipulated to waive the appeal on, where Mr. Alexander states that, you know, you got a little boo-boo down there. And he calls it a boo-boo, this man who received 24 stitches across his face and nearly had his throat cut. You know, we're aware of what happened to you down there. We don't think you need protection in the Security Classification Committee review upon his arrival at MVP. And both of these defendants are sitting right there when this happens, and neither of them do anything. You're just asking for a trial on the merits? Just asking for a trial, Your Honor. Thank you. All right, thank you. Any rebuttal? I just want to respond to two points from counsel's statements. Nemesto never said we can live with that, that this is a risk we can live with. I just wanted to clarify that for the Court. Referring to – Well, it's a factual dispute. The other guy says he said it, and he says he didn't. Don't we have to accept at this point that he said it? We are – my contention is that counsel is mischaracterizing Nemesto's response. Nemesto never responded. The testimony will say that Nemesto had a – based upon plaintiff's version of events, Nemesto and plaintiff had a conversation. But plaintiff never accused Nemesto of saying we can live with that. So I wanted to clarify that. And there was some discussion as to a written request. Now, in Marquette Branch Prison, as in the rest of the MDOC facilities, there is an official form that a prisoner can fill out if they're seeking – if they're explicitly seeking protective custody. And on that form, they're to put down as much detailed information as possible. Now, what we have in this case is a prisoner who is alerting – who is alerting the prison officials as to his conditions, but he never sat down and filled out this request for protection. Well, in your first argument, you said that the law wasn't clearly established in these facts because the information was vague. That was the first one. Now you're adding – it's in your brief. But now you're adding that – and he didn't fill out a form. So what, the law – the law would have to be clearly established that if you have a form and you don't fill it out, then it's okay, you can ignore claims that somebody's life is in danger? No. My point is that this form goes to the additional step of putting the defendants on notice or even on notice as to – this is, you know, at this point, here are these facts. I'm willing to put my name on this form and to create this paper trail to get this properly investigated. Now, the plaintiff has the burden of showing that the officers were not entitled to qualified immunity. And it remains the defendants' contention that the plaintiff has not demonstrated the law was clearly established, that what he – what the plaintiff did was enough. And notably, the district court below did not analyze the clearly established prong of the qualified immunity analysis. So what succinctly is missing here in order for his request for protection to fall within what you would agree was clearly established law? What should he have done and how should he have done it and to whom should he have done it to fit within what the law currently says? Well, I think in this particular case, a written request based upon the facts, him obviously having been attacked, and filling out the written form, the prison form, I think that would have gotten the plaintiff. The form would have said he was attacked. And by whom, right? Sure, yes. They already knew that. They already knew that, right? Yes. So the form doesn't add anything there. So what else was supposed to be in the form that he didn't communicate orally that would have provided the missing information? The individuals as to whether or not – sorry, the individuals that he believed would be out to get him. You know, basis for information, just any other things that, you know, I'm hearing that somebody is attacking me. These are people I'm talking to. These are the people that has given me the information. These are the people I think are affiliated with the Latin Counts who may be out to get me. All of this information. At any point, do the records show that the prison officials refused his request for protection because of the so-called vague nature of his complaints? Is that in the record in any place? The record establishes that they don't think he gave them enough. Where would we look for that in the record? That the problem here was the inadequacy of the basis of his request. Well, it would be in the affidavits of the prison officials, and that's 107-8 and 9. And also the affidavits. Any other place we should look? I would say the deposition transcript because the missile in place were deposed. Okay, thank you. Thank you very much. Thank you. Please submit it.